TORREY and wife and others *v.* SHAW and others.

---

Testator devised his estate, real and personal, to executors, in trust for daughter for life ; and after her death, for all her children (testator's grandchildren) equally and their heirs when the youngest came of age. Rents, until then, to be applied in education. Proviso, that if his grandchildren died leaving issue, the latter substituted. Executors had discretion to advance any part of their share before majority. One grandchild died before his mother, but of full age, unmarried. *Held*, that the grandchildren took vested estates at the death of the testator. Also, *held*, that the deceased grandchild's share did not go to his father (the testator having been the mother's ancestor.)

The words *ex parte materna*, at common law, apply to a descendible estate when it is a question of inheritance among collaterals on the father's or mother's side. If the point be as to property acquired by purchase and the party last seised die without issue or lineal descendant, the heirs on the father's side are preferred and those *ex parte materna* do not take until the

father's side are extinct. But where the estate comes to the person last seised by descent and no act has changed it, the descent goes to the blood of the first purchaser, so that if the property came by descent from or through the mother, it will descend *ex parte materna.*

On a bill for partition of a descended estate and an adjustment of rights and claims therein, the executors in trust cannot bring in their commissions on rents, moneys and disbursements. *It would seem,* that they could only get at them through a bill in the nature of a supplemental bill.

*1839.*

*TORREY*
*v.*
*SHAW.*

BILL filed for a partition and settlement of the estate of Robert Robinson, deceased. The cause came before the court on exceptions to a master's report and these exceptions involved the construction of the will of Mr. Robinson.

The will was dated on the twentieth day of October, one thousand eight hundred and twelve, and took effect by the death of the testator in the month of December following.

After some specific bequests, he devised all the rest and residue of his estate, real and personal, to his executors in trust, for the sole and separate use of his daughter Jane Shaw, during her natural life, into whose hands the rents, issues and profits thereof were to be, from time to time, paid upon her own receipt, &c. And upon further trust, after the decease of his said daughter, for all her children equally and their heirs, executors and administrators for ever, when the youngest of the said children should come of age ; while the rents, income and profits thereof, until that period, were to be applied at the discretion of the executors or the survivor or survivors of them to the education and maintenance of the said children. It was then provided that if any of his said daughter's children should die before her, leaving issue, the latter should stand. in the place of and be entitled to what its parent would have had if living. And further, that the executors or the survivor or survivors of them might, before the youngest of the said children came of age, advance to any of the testator's grandchildren any part of their respective shares of the estate, if it should be thought necessary for their advancement in life ; but this was to depend upon the discretion of the executors and was not to be done during his daughter's life without her approbation and consent in. writing. The will then provided that if the son-in-law, William Shaw, should survive the testator's said daughter, he should have one third of the rents and pro-

*November 12, 19, 21, 1839.*

*Will.*
*Devise.*
*Ex parte materna.*
*Partition.*
*Executor's commis-sions.*

fits of the estate during his life and towards his maintenance,. but the same was not to be liable for his debts. And it further declared that if his said daughter Jane should die without leaving issue surviving at her death, then the whole of the estate, subject to the provision made for his son-in-law, should go and belong to the right heirs of the testator and be in trust for them accordingly.

The testator's daughter, Mrs. Shaw, died on the twenty-fifth day of March, one thousand eight hundred and twenty, leaving a husband and seven children her surviving; and these children, with the exception of Robert (one of the sons, who died before his mother of full age but unmarried,) were living. Robert's death occured before the youngest child came of age, at which time the trust in the executors ceased.

The main question presented upon the exceptions was, whether one-seventh of the estate, on the death of Mrs. Shaw and before the youngest of her children came of age, went to the father, William Shaw, as heir of the son or whether this share devolved upon the surviving children and left the estate to be divided into six equal parts among them ?

Mr. *Roosevelt*, for the complainants.

Mr. *B. F. Butler*, for the defendant William Shaw.

Mr. *Sandford*, for the North River Company, assignees of Edward Shaw.

*April* 6, 1840.

THE VICE-CHANCELLOR :—In order to determine the question as to this seventh of the estate, it is necessary to consider : 1st. Whether Robert took a vested and transmissible estate under the will or a contingent interest to vest only on his living until the youngest child attained the age of twenty-one ? And, if a vested estate, then 2d. Whether it passed to the father at his death ?

The will gives the legal estate to trustees during the period of the youngest child's minority. The interest of Mrs. Shaw for life and of her children in remainder, under the trust, though an equitable one, is, in respect to the construction of the will, to be looked upon in the same light as the legal estate would

1839.

TORREY
*v.*
SHAW.

have been, had the devise been to them directly without the intervention of any trust or trustee, and must be governed by the same rules of law. In looking attentively at the peculiar phraseology of the will and into the general design and plan of it, I cannot resist the conclusion that the testator intended to give vested estates or interests to his grandchildren, as a class, at the same time that he gave the beneficial interest for life to his daughter. She was first to enjoy the property, and it is put in trust for her benefit during life; and it is a branch of the same trust, created at the same time and in the same persons, that was to continue for the future benefit of all her children during the minority of the youngest. Time here relates to the periods of enjoyment, and not to the vesting of the gift; and in all such cases the rule is that it vests from the death of the testator.

The words, " and upon further trust, after the decease of my daughter, for all her children," &c., imply no postponement of the time when the gift was to be considered as made or as taking effect in interest, but only of the time when they are to have the possession or enjoyment of the income; and the residue of the clause, " when the youngest of the said children shall come of age," taken in connection with what follows in the will, clearly imports nothing more than a limit to the duration of the trust, for then the trust was to cease; and, until that period, the rents were to be applied, by the executors, at their discretion, to the education and maintenance of the children. That the testator intended they should take interests from the time of his death is still more clearly shown by the subsequent clause of the will, which authorizes the executors, in their discretion, to advance to any of the grandchildren any part of " their respective shares of the estate, &c.," before the youngest came of age and even during the particular estate of their mother, with her approbation and consent in writing; for why speak of " their shares," unless he intended they should be considered owners of aliquot parts of the estate, even before the time arrived for them to possess it? The intention of the testator, when it can be ascertained from the context, is always to govern in the construction of a will and effect is to be given to it accordingly; and it seems to me that any other meaning, than such as would allow of vested re-

mainders in the grandchildren, would be inconsistent with the language and obvious intent of the instrument. It is true that the share of each child was liable to be devested by the happening of either of the events provided for in the will, but no further; such as, any of them dying before their mother and leaving issue, in which event the issue were to take substitutionally; this limitation over being valid, as an executory devise, to pass the estate to such issue, as purchasers; but no such event has happened to give effect to this clause of the will.

So, another event is provided for, which, if it had happened, would have defeated their estate; and that is, all the children dying before their mother or, in the words of the will, if she *had died without leaving issue surviving* at her decease. But the possibility of these events did not render the estates previously given contingent in law, as contradistinguished from vested estates or alter the character of the interest which they took in the first instance. It is true, moreover, that the gift, being to all the children of his daughter as a class, vested in such as were *in esse* at the death of the testator and opened to let in the after-born children, who became equally entitled; but this partial change or shifting of the estate does not take from it the essential character of a vested estate in all and each of them from the death of the testator. Of course, they took subject to the life of their mother; and, after her death, their father surviving, subject to his one-third of the rents and profits for life, as provided for in the will.

Robert, having thus acquired a vested estate in one-seventh of the property, which was alienable in his lifetime and transmissible by descent or devise at his death, did the same pass to his father as his heir or to his brothers and sisters? The common law excludes the parent and all lineal ancestors from taking by inheritance from the son, because it considered that property could not ascend, but must always descend, either lineally or collaterally; but our statute for regulating descents has changed this rule of law and conferred upon the father the right to take, as heir of the son dying without lawful issue, "unless the inheritance came to the son from the part of his mother; in which case it shall descend, as if the son had survived his father." This was the third rule or canon of descent

in the statute of 1786, and it has been continued in the revisions down to 1830, and is preserved in the present revised statutes of the state : 1 Greenleaf, 206 ; 1 Laws N. Y. 1813, 53 ; 1 R. S. 751.

The father's right to his son Robert's share of the estate, in this instance, is denied, on the ground that it came to Robert " from or on the part of his mother," it having been a gift to him by the will of his grandfather on her side ; and it is contended that this is a case within the statute, which excludes the father from taking. On the other hand, it is insisted that property coming from or on the part of the mother, within the meaning of the statute, must come to the son, by descent or operation of law, directly from the mother or from some other source through her and in her right, and not by gift, devise or in any other way by purchase independently of her.

This question upon the statute, the learned and able counsel who argued this cause admit has not before, to their knowledge, been presented for adjudication; and my own researches have not furnished me with the least trace of a decision upon the point in any of the other states, where similar statutory regulations are found to exist. Nor among the decisions of the English courts can any such case be found, because they have no statute to give rise to the question. I am, therefore, left to follow the dictates of my own judgment in giving to the words, as used in the statute, their proper application and meaning. The words " *ex parte materna,*" are of frequent occurrence in the common law; and would there seem to apply to none other than a descendible estate, where it becomes a question among the collateral kindred of the person last seised, whether those on the father's side or those on the mother's are the persons entitled to the inheritance ; for, if it be property acquired by purchase, either by grant or devise, to the person last seised, and he dies without issue or lineal descendants, the heirs on the father's side are preferred, and those *ex parte materna* have no right unless all on the father's side are extinct. But, if the estate came to the person last seised by descent and he was in by no newly acquired title and had done no act to change the descendible nature and quality of the estate, then the question is, whether the heirs on the part of the father or those *ex parte materna* are entitled ? for those to

take must be of the blood of the first purchaser; and if the property came by descent from or through the mother or in her right, then those of the same blood with her are the persons to inherit: Chitty on Descents, 131.

Hence I conclude that, in general, it is only with reference to property which has come to the person last seised by descent that the expression is used and the common law rule, permitting heirs on the part of the mother to take, can be applied. But I think it does not follow that the legislature intended to use those words in that limited sense or that they meant to restrict the application of them to estates coming by descent. Property may, with the same propriety, be said to come to a man when it is given or devised to him, as when he takes it by descent or operation of law; for he is as passive in the acquisition of it in the one case as in the other. In both it comes by no act of his own and, perhaps, without any previous knowledge on his part. If he were to make a purchase by paying money and receiving a deed, it could hardly be said that the property came to him within the meaning of the statute; but the other modes of acquiring it would seem to be within the letter; and I think are within the meaning also. So "on the part of his mother" is a phrase which admits of property coming from the mother by gift as well as by descent; or, as in this instance, by devise from the grandfather on the mother's side; and the sense is complied with when it comes on her side of the house or family, as distinguished from the father's side, proceeding along the ancestral line of which she makes a part and following the stream which, in law, is supposed to run through the veins of parent, child, grandchild, &c., all being successively of the same blood. In this view of the subject, it is quite immaterial by what means the transmission takes place, whether by the act of the ancestor or by the act of law.

We have, in the statute itself, an instance of this indifference as to whether the property comes by devise or descent. In the fourth canon, regulating the descent to brothers and sisters, it is provided that those of the half blood shall inherit equally with those of the whole blood, " unless where such inheritance came to the person by descent, devise, or gift of some one of his or her ancestors ; in which case all those, who

are not of the blood of such ancestors, shall be excluded from such inheritance." Here is an exclusion, as well where property comes by devise or gift—each of which is a species of purchase—as where it comes by descent, unless the parties claiming be of the blood of the donor. This proceeds upon the principle that blood of the ancestor is necessary to enable collateral relations to take, where the property came from an ancestor by either of the modes of transmission spoken of and is not confined to property which comes in one mode only, viz : by descent. And I cannot discover any good reason why the same rule should not be observed—for the principle must be the same—where the father claims to be heir of the son in respect to property which comes by devise or gift from a maternal ancestor, as well as by descent, there being no consanguinity between such ancestor and father.

I am convinced that it was not the intention of the law or its makers to restrict the meaning or application of this rule to property coming by descent ; and I am strengthened in this conviction by what I find in the present revised statutes ; which, though not governing this case, appear to reflect some light on the previous law and to furnish a legislative interpretation of its meaning. In the revised statutes as amended by the act of April 20th, 1830, the rule is declared in these words : " In case the intestate shall die without lawful descendants and leaving a father, then the inheritance shall go to the father, unless the inheritance came to the intestate on the part of his mother and such mother be living."

This exclusion of the father, as heir of the son, must necessarily take place in some instances where the property has come by devise or gift of a maternal ancestor or by gift *inter vivos* of the mother herself ; for, while the mother is living, her son could not be invested with property by descent from her or from a remoter ancestor through her and in her right. As the law stands in the revised statutes, therefore, it seems to me clearly to contemplate that property may have come to a deceased son, on the part of his mother, by some other means than by descent or mere operation of law ; from the inheritance of which the father is cut off as effectually as if it had descended directly from her. Nor do I perceive any thing in the remaining part of the section, as amended, whereby a

1839.

TORREY
v.
SHAW.

1839.

TORREY
v.
SHAW.

father, if the mother be dead, may take the inheritance for life or in fee, as the case may be, to conflict with that view of the subject; since the expression "the inheritance descending on her part," may mean nothing more than the property which passes, in the event of her death, by either of the modes of transmission alluded to so long as it is confined to her ancestral line.

My conclusion is, that William Shaw, the father, is not entitled, as heir of his deceased son Robert, to the one-seventh of the estate in question; but that it must be regarded as property which came to the son from or on the part of his mother, though it came by devise or gift from his grandfather on her side and not by descent.

This result is in accordance with the decree made in a former cause, on the 2d July, 1830, touching a partition and sale of a part of the estate, wherein William Shaw the father was a complainant and in which he was content to make no claim as heir at law of his deceased son Robert. The effect of that decree upon the claim, which he has thought proper to set up in the present case, it is unnecessary to consider.

This disposes of the first exception taken by William Shaw to the master's report, so far as the report disallows his claim as the heir at law of his deceased son and also of the exception of Christopher R. Robert, as a judgment creditor of William Shaw, claiming a lien upon his supposed share of the estate.

Another exception was taken to the report by William Shaw, as executor and trustee under the will, because the master disallowed his claim for commissions on the rents and moneys collected and disbursed by him; and refused to hear any testimony in support of his claim. The master considered such claim to be inadmissible under the order of reference; and I think the master decided correctly. The bill calls for no account from the executors and trustees. The trust having terminated, the bill was filed for an adjustment of the rights and titles of the present owners of the real estate and of those having claims upon or interests in it and for a partition and sale, as far as might be necessary, in order to make a partition or distribution among them; and though the defendant, William Shaw, in his answer submits that ample provision for the

expenses and commissions of the executors and trustees should be made and, if there is no lien in law upon the estate for the commissions and expenses, that this court should, by its order or decree, provide for the same out of the proceeds of the estate, yet he has nowhere set forth in his answer the particulars of his claim for commissions or the amount thereof; and has taken no pains to bring the matter of such claim properly before the court for adjudication. Perhaps a bill on his part or one in the nature of a cross-bill may be necessary in order to enable him to substantiate such a claim. But, at any rate, the master could not investigate it under the order of reference as entered, because it confers on him no authority for that purpose ; and the court cannot, upon an exception to a report, undertake to pass upon its merits or make a new order of reference, but the party must adopt some other course to bring it before the court.

Upon the whole, then, all the exceptions that have been taken to the master's report must be overruled ; and the report stand confirmed.

Decree accordingly.